IN THE SUPREME COURT OF NORTH CAROLINA

No. 128A18

Filed 7 December 2018

AZURE DOLPHIN, LLC, a Nevada Limited Liability Company, and JEAN-PIERRE BOESPFLUG

v.

JUSTIN BARTON; BARTON BOESPFLUG II, a California Limited Liability Partnership; HESS CREEK, LLC, an Oregon Limited Liability Company; ROYAL ASCOT, LLC, an Oregon Limited Liability Company; and VINTAGE OAK II, a California Limited Partnership

Appeal pursuant to N.C.G.S. §§ 7A-27(a)(2) and 7A-27(a)(3) from a final opinion and order dated 2 October 2017 and an interlocutory order entered on 2 June 2017, both by Judge Adam M. Conrad, Special Superior Court Judge for Complex Business Cases, in Superior Court, Forsyth County, after the case was designated a mandatory complex business case by the Chief Justice pursuant to N.C.G.S. § 7A-45.4(b). Heard in the Supreme Court on 1 October 2018.

*Blanco, Tackabery & Matamoros, P.A., by Peter J. Juran, M. Rachael Dimont, and Chad A. Archer, for plaintiff-appellants.*

*Bell, Davis & Pitt, P.A., by Andrew A. Freeman and Alan M. Ruley, for defendant-appellees.*

ERVIN, Justice.

The principal issues before the Court in this case are whether the trial court properly dismissed the claims that plaintiffs Azure Dolphin, LLC, and Jean-Pierre Boespflug asserted in their first amended complaint and whether the trial court

properly denied plaintiffs' second motion to amend their complaint. After careful

consideration of plaintiffs' challenges to the trial court's orders in light of the

applicable law, we conclude that the challenged orders should be affirmed.

## I. Factual Background

### A. Substantive Facts

Mr. Boespflug and defendant Justin Barton[1] began working together in the

real estate investment business approximately thirty years ago. As part of their

business strategy, Mr. Boespflug and Mr. Barton created "various entities to acquire

and hold investment properties throughout the United States," including "large

apartment complexes and commercial buildings." Among the investment entities

that resulted from this process were defendants Hess Creek, LLC, an Oregon limited

liability company formed in 1996; Royal Ascot, LLC, an Oregon limited liability

company formed in 2001; and Barton Boespflug II and Vintage Oak II,[2] both of which

were California limited partnerships formed in 1986.

According to the allegations contained in the amended complaint, Mr. Barton

served as manager or general partner for Hess Creek, Royal Ascot, Barton Boespflug,

Vintage Oak, and the other investment entities, while Mr. Boespflug "contributed the

---

[1] Mr. Barton and his wife, Janet Barton, control and operate a property management business located in Winston-Salem known as Viking Properties.

[2] While plaintiffs' amended complaint refers to this entity as both "Vintage Oak" and "Vintage Oaks," we note that plaintiffs' briefs refer to the entity as "Vintage Oak." We, therefore, will refer to this entity as "Vintage Oak" throughout the remainder of this opinion.

majority of the capital" and served as either a member or limited partner of each of the investment entities. Mr. Boespflug gave Mr. Barton "some discretion to manage the Properties," with Mr. Barton having the responsibility for "reporting to [Mr.] Boespflug intermittently on the state of the portfolio." At some unspecified point in time, Mr. "Boespflug formed Azure Dolphin," a Nevada limited liability company, to which he transferred a portion of his economic interests in the investment entities that he and Mr. Barton had created and operated.

On 21 April 2011, Mr. Boespflug, a dual citizen of France and the United States, moved back to Paris. On 26 April 2011, Mr. Barton e-mailed Mr. Boespflug for the purpose of requesting his assistance in securing a new loan and refinancing two existing loans. In his reply, Mr. Boespflug "explained to [Mr.] Barton that his financial position was no longer conducive to personally guaranteeing loans" relating to the investment entities. After a lender "demanded that both Azure [Dolphin] and [Mr.] Boespflug guaranty the new loans," Mr. Boespflug reiterated "that this was not an option."

Subsequently, Mr. Barton converted Mr. Boespflug's membership interests in the investment entities to notes payable with a face value that "was a fraction of the true value of [Mr.] Boespflug's membership interests." More specifically, on 1 January 2012, Mr. Barton issued promissory notes to Mr. Boespflug in order to transfer "all of the Investment Entities['] interests [that Mr.] Boespflug [had] previously assigned to Azure Dolphin" to the following entities: Barton Boespflug;

Viking Property Investors, LLC; Ash Creek, LLC; Vintage Oak; and Willamette River I, LLC. On 1 January 2013, Mr. Barton issued a second series of promissory notes to Mr. Boespflug by means of which he acquired "the remainder of [Mr.] Boespflug's interest in the Investment Entities." The promissory notes in question reflected the value of the interests that Mr. Boespflug and Azure Dolphin owned in the investment entities, which, according to appraisals that Mr. Barton had obtained, amounted to a total of $2,008,006. In plaintiffs' view, Mr. Barton "manipulated" the appraisals so as to undervalue Mr. Boespflug's interests in the investments entities.

After engaging in these transactions, Mr. Barton "unilaterally amended the operating agreements of the Investment Entities with terms considerably more favorable to him," "sold at least six of the [p]roperties" owned by the investment entities, and transferred properties held by the investment entities "into his own name and to different entities controlled by [Mr.] Barton and/or his immediate family members."

On 15 January 2013, Mr. Barton sent an e-mail to Mr. Boespflug to which was attached a letter signed by Mr. Barton that had as its subject line "Buyout of Jean-Pierre Boespflug, effective 1/1/2013." The letter stated that:

> Effective January 1, 2013 (pursuant to amended re-stated operating agreements, dated November 1, 2011), your economic interest in partnerships, per MAI appraisals, will be replaced with promissory notes. These partnerships are as follows: Ash Creek, LLC, Hess Creek, LLC, Jay's Canby, LLC, Jay's Commonwealth Park I, LLC, Jay's Commonwealth Park II, LLC, Newby House LLC,

> Richmond Park, LLC, and River Valley Investors, LLC.
> The respective promissory notes and corresponding loan
> amortization schedules are enclosed.

According to the amended complaint, these promissory notes accompanied "an otherwise unrelated email with no indication of the importance of the communication and thus this email remained unread until 2016." Mr. Boespflug claimed that he did not actually learn of the actions reflected in this letter until the summer of 2016.

### B. Procedural History

### 1. Trial Court Proceedings

### a. Preliminary Proceedings

On 16 December 2016, Mr. Boespflug, Azure Dolphin, and JPB Holdings, Inc.,[3] commenced this action by filing a complaint asserting fifteen claims, including individual and derivative claims for constructive fraud, breach of the duty of loyalty, breach of the duty of care, breach of the duty of good faith and fair dealing, civil conspiracy, fraudulent conveyance, and unfair and deceptive practices, and seeking various remedies against twenty-one defendants,[4] including Mr. Barton, certain of

---

[3] Although JPB Holdings, Inc., participated in the proceedings before the trial court, it is not a party to the proceedings on appeal.

[4] The defendants named in the original complaint were Mr. Barton; Janet Barton; Viking Properties; Sanur Brokerage; Viking Property Investors; Montpelier Investors, LLC; Jay's Canby Florence, LLC; Willamette River One, LLC; Victoria Place General Partnership; Jay's Commonwealth Phase 1, LLC; Jay's Commonwealth Phase 2, LLC; Ash Creek; Barton Boespflug; Hess Creek; Jay Canby, LLC; Newby House, LLC; Richmond Park, LLC; River Valley Investors, LLC; Royal Ascot; Vintage Oak; and Willamette River One.

the investment entities, and other defendants.  On 19 December 2016,[5] the Chief

Justice designated this case as a mandatory complex business case.  On 10 February

2017, defendants[6] filed a motion to compel arbitration or, alternatively, to dismiss

plaintiffs' complaint for lack of personal jurisdiction, lack of subject matter

jurisdiction, failure to join a necessary party, insufficiency of process, failure to state

a claim upon which relief could be granted, and "the existence of arbitration

agreements."  On the same day, Sanur Brokerage filed an answer to plaintiffs'

complaint.

On 14 March 2017, plaintiffs filed a motion seeking leave to file an amended

complaint, a copy of which was attached to their amendment motion.  The proposed

amended complaint attempted to add eleven additional defendants and included a

number of new factual and legal assertions, including allegations that the trial court

had jurisdiction over all of the named defendants pursuant to N.C.G.S. § 1-75.4(1)

and that, even though certain of the investment entities had been organized under

the laws of other states, they were "instrumentalities of [Mr.] Barton as he engages

in substantial activity within North Carolina" and had "received property and

proceeds of property that belong to North Carolina domestic entities and benefit from

---

[5] The e-filing date and file-stamp date associated with many of the documents referenced in this case differ slightly.  In the event that there is such a discrepancy, we have utilized the e-filing date in this opinion in lieu of the date upon which the document was file-stamped.

[6] All of the defendants named in the original complaint except for Viking Properties joined the motion to dismiss the original complaint.

bad acts committed by [Mr.] Barton inside of North Carolina or directed at North Carolina corporations." In seeking leave to amend their complaint, plaintiffs asserted that the amended complaint would "cure deficiencies alleged by the [d]efendants in their joint Motion to Dismiss filed on February 10, 2017[,] including naming necessary parties previously unknown to the [p]laintiffs."

On 6 April 2017, the trial court granted plaintiffs' amendment motion, ordered plaintiffs to file their amended complaint on or before 11 April 2017, and denied defendants' dismissal motion without prejudice to their right to move to dismiss the amended complaint. In the 6 April 2017 order, the trial court noted that plaintiffs had "failed to state the position of opposing counsel" as required by Business Court Rule 7.3 and indicated its expectation that plaintiffs would "comply with the General Rules of Practice and Procedure for the North Carolina Business Court in future filings."

On 18 April 2017, plaintiffs filed an amended complaint. On 19 April 2017, defendants filed a clarification motion in which they asserted that plaintiffs had failed to file their amended complaint by 11 April 2017 and had, instead, sought an extension of time within which to file their amended complaint. In addition, defendants noted that, on 17 April 2017, the trial court had denied plaintiffs' extension motion and had, instead, ordered plaintiffs to "file the version of their Amended Complaint attached to their March 14, 2017 Motion to Amend no later than 5:00 [p.m.] on April 18, 2017." Finally, defendants asserted that plaintiffs' amended

complaint had been filed without authorization and differed from the proposed amended complaint that had been attached to plaintiffs' amendment motion.

On 20 April 2017, plaintiffs filed an errata notice and the version of the amended complaint that had been attached to their amendment motion. On 21 April 2017, the Business Court entered an order striking the amended complaint that plaintiffs had filed on 18 April 2017 and declaring that the amended complaint that plaintiffs had filed on 20 April 2017 was the relevant pleading for purposes of future proceedings in this case.

On 12 May 2017, plaintiffs filed a motion for leave to file a second amended complaint, to which they attached a proposed amended complaint. On 19 May 2017, defendants filed a motion to dismiss plaintiffs' amended complaint. On 22 May 2017, plaintiffs filed an errata notice and a new version of the proposed second amended complaint.

On 30 May 2017, the trial court entered an order denying plaintiffs' second amendment motion. In its order, the trial court stated that, while "[p]laintiffs filed the correct version of the amended complaint on April 20, 2017," they did not do so until "31 days after [p]laintiffs first notified the Court that they intended to file a second motion for leave to amend." In addition, the trial court pointed out that the "proposed second amended complaint undoes many of the changes made in the first amended complaint," such as the elimination of "Sanur Brokerage LLC, Viking Properties, LLC, and all individuals except for Justin and Janet Barton as

defendants." According to the trial court, plaintiffs' second amendment motion involved undue delay, suggested the existence of a "dilatory motive," and was accompanied by neither a brief nor a statement of the position of opposing counsel as required by the applicable Business Court Rules.

On 8 June 2017, plaintiffs voluntarily dismissed their claims against Sanur Brokerage, Viking Properties, and the "necessary defendants" that plaintiffs had named in the amended complaint. In addition, plaintiffs voluntarily dismissed their unjust enrichment, conversion, and derivative claims for breach of fiduciary duty, imposition of a constructive trust, and punitive damages.

### b. Trial Court's Order

On 2 October 2017, the trial court entered an order granting defendants' dismissal motion. *Azure Dolphin, LLC v. Barton*, No. 16 CVS 7622, 2017 WL 4400223, at *11 (N.C. Super. Ct. Forsyth County Bus. Ct. Oct. 2, 2017), *appeal dismissed in part,* 2018 WL 3241726, at *3 (N.C. Super. Ct. Mar. 28, 2018). After noting that "[e]ach of the ten [d]efendants [challenging the trial court's jurisdiction over their persons had] filed an affidavit stating it is not domiciled in and does not have its principal place of business in this State," the trial court concluded that "[p]laintiffs have not carried their burden to support the exercise of personal jurisdiction" given their failure to produce "evidence of any 'continuous and systematic' contacts between these ten [d]efendants and North Carolina giving rise to general jurisdiction," citing *Goodyear v. Brown*, 564 U.S. 915, 919, 131 S. Ct. 2846,

2851, 180 L. Ed. 2d 796, 803 (2011), or any "evidence that the ten [d]efendants 'purposely avail[ed]' themselves 'of the privilege of conducting activities within' North Carolina, such that the exercise of specific jurisdiction would be appropriate," citing *Cambridge Homes of N.C. L.P. v. Hyundai Constr., Inc.*, 194 N.C. App. 407, 413, 670 S.E.2d 290, 296 (2008) (quoting *Lulla v. Effective Minds, LLC*, 184 N.C. App. 274, 279, 646 S.E.2d 129, 133 (2007)). As a result, the trial court dismissed the claims that plaintiffs had asserted against these ten defendants for lack of personal jurisdiction.

After dismissing the claims that had been asserted on behalf of JPB Holdings on the grounds that it lacked a valid corporate existence, the trial court determined that it lacked the authority to dissolve Barton Boesplug and Vintage Oak, both of which were California limited partnerships, and Hess Creek and Royal Ascot, both of which were Oregon limited liability companies. In addition, although Jay's Commonwealth Park and Jay's Commonwealth Park Phase II were both North Carolina limited liability companies, the trial court found that, since neither Azure Dolphin nor Mr. Boespflug were members of the entities in question, both plaintiffs lacked standing to assert a dissolution claim involving those entities, citing N.C.G.S. § 57D-6-02(2) (providing that "only a member of [a limited liability company] has standing to assert a claim for judicial dissolution"). Lastly, the trial court dismissed plaintiffs' claim seeking the removal of Mr. Barton from his position as manager of

the investment entities[7] on the grounds that such relief must be sought in a derivative, rather than an individual action, and that plaintiffs had failed to make the demand upon the entities in question required by N.C.G.S. § 57D-8-01(a)(2) before filing their complaint in this case.

Thirdly, the trial court addressed plaintiffs' claim seeking to have Mr. Boespflug's removal as a member of the investment entities and Mr. Barton's efforts to "unilaterally amend[ ] the operating agreements of some or all of the Investment Entities" invalidated. In concluding that these claims should be dismissed, the trial court determined that plaintiffs had failed to join all of the parties necessary for a proper adjudication of the claims in question, citing N.C.G.S. § 1-260 (providing that "all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceedings"), on the grounds that, since "[a]ny declaration invalidating an operating agreement or altering the LLC's membership under the operating agreement would, 'as a practical matter,' adversely affect the rights of these members," it would be improper for the trial court to adjudicate the validity of the operating agreements without joining each member of the relevant investment entities, quoting *N.C. Monroe Constr. Co. v. Guilford County Bd. of Educ.*, 278 N.C. 633, 640, 180 S.E.2d 818, 822 (1971). In addition, the trial court determined that

---

[7] Any reference to a "removal claim" throughout the remainder of this opinion should be understood as referring to plaintiffs' request for a judicial declaration that Mr. Barton be removed as manager or general partner of the investment entities.

"any attempt to cure would be futile" given that "all of the additional parties reside outside North Carolina, and there are no allegations that would support the exercise of personal jurisdiction over them." As a result, the trial court dismissed plaintiffs' claims seeking the invalidation of Mr. Barton's amendments to the operating agreements of the investment entities and the restoration of Mr. Boespflug's interests in the investment entities for lack of subject matter jurisdiction.

The trial court next considered whether plaintiffs' amended complaint contained sufficient allegations to state a hybrid claim for breach of fiduciary duty and constructive fraud.[8] Although these two claims had been pleaded jointly in the amended complaint, the trial court noted that they required proof of different elements. However, the existence of a fiduciary relationship is necessary to the successful assertion of both claims, citing *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001), and *Crumley & Assocs., P.C. v. Charles Peed & Assocs., P.A.*, 219 N.C. App. 615, 620, 730 S.E.2d 763, 767 (2012)). In spite of the fact that plaintiffs alleged that Mr. "Barton [had] abused his position of trust and confidence by altering the records of the Investment Entities, diverting the income streams and opportunities to himself, other entities under his control and other insiders of Viking Properties . . . for the purpose of benefitting himself to the detriment of the

---

[8] As the court pointed out, plaintiffs had already voluntarily dismissed their claims against Viking Properties, so the only remaining hybrid constructive fraud and breach of fiduciary duty claim was the one that plaintiffs had asserted against Mr. Barton and Viking Property Investors.

Investment Entities and the members," the trial court determined that plaintiffs "ha[d] not adequately alleged the existence of a fiduciary relationship" as either a matter of law or fact. In view of the fact that, "as a matter of law, a manager of [a limited liability company] does not owe a fiduciary duty to its members," the trial court concluded that plaintiffs' allegation that Mr. Barton managed the investment entities and that Mr. Boespflug was a member did not establish the existence of a fiduciary relationship between the two men as a matter of law. In addition, the trial court determined that the amended complaint did not "meet the 'demanding' standard for alleging that a fiduciary relationship exists as a fact," citing *Lockerman v. S. River Elec. Membership Corp.*, ___ N.C. App. ___, ___ 794 S.E.2d 346, 352 (2016), because the amended complaint, which depicted a relationship in which "[Mr.] Boespflug contributed most of the capital while [Mr.] Barton contributed most of the real estate expertise," did not reflect a dynamic in which either party "held 'all the financial power or technical information' or exercised dominion and influence over the other," citing *Lockerman*, ___ N.C. App. at ___, 794 S.E.2d at 352 (quoting *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008)). As a result, the trial court dismissed plaintiffs' hybrid constructive fraud and breach of fiduciary duty claim.

In addressing plaintiffs' remaining claims, the trial court began by dismissing the fraudulent conveyance claim that plaintiffs had asserted against four defendants on the grounds that plaintiffs' "vague" assertions that they were entitled to recover

"real property, proceeds from that property and/or revenue streams associated with the property" were insufficiently particular to satisfy the requirements of N.C.G.S. § 1A-1, Rule 9. In addition, given that plaintiffs had relied upon "instances of fraud, constructive fraud, and fraud by omission" to establish that defendants had committed an unfair or deceptive act, plaintiffs' failure to "adequately allege facts to support their claims for constructive fraud and fraudulent conveyance" necessarily demonstrated that plaintiffs had failed to "allege[ ] facts to show that [d]efendants committed an unfair or deceptive act under [N.C.G.S. §] 75-1.1." The trial court dismissed plaintiffs' civil conspiracy claim on the grounds that civil conspiracy does not constitute an independent cause of action and that the trial court had already dismissed the fraud-based claims upon which plaintiffs' civil conspiracy claim rested. Finally, the trial court dismissed plaintiffs' "purported 'claims for relief' for injunction, appointment of a receiver, constructive trust, and punitive damages" on the grounds that these "claims" were actually "*remedies*, not *causes of action*." As a result, the trial court dismissed all of the claims that plaintiffs had asserted against each defendant. Plaintiffs noted an appeal to this Court from the trial court's orders.

## 2. Appellate Proceedings

In seeking to persuade us to overturn the challenged trial court orders, plaintiffs contend that the trial court erred by dismissing their claims for Mr. Barton's removal as manager or general partner of the investment entities based upon plaintiffs' purported failure to comply with what is "commonly known as the 'North

Carolina Limited Liability Company Act,' " citing N.C.G.S. §§ 57D-1-01, 57D-1-02(a). More specifically, plaintiffs note that N.C.G.S. § 57D-8-06 provides, in pertinent part, that, "[i]n any derivative proceeding in the right of a foreign [limited liability company], the matters covered by this Article will be governed by the law of the jurisdiction of the foreign [limited liability company's] organization," so that the statutory pre-suit "demand requirement" set out in N.C.G.S. § 57D-8-01(a)(2) is inapplicable to Barton Boespflug, Hess Creek, Royal Ascot, and Vintage Oak, each of which was organized under either California or Oregon law. As a result, plaintiffs contend that Oregon law governs whether and to what extent plaintiffs must satisfy a statutory pre-suit demand requirement before commencing a derivative action on behalf of Hess Creek and Royal Ascot and note that Oregon law recognizes a futility exception to its statutory pre-suit demand requirement, citing Or. Rev. Stat. Ann. § 63.801(2) (West 2018) (providing that "a complaint in a proceeding brought in the right of a limited liability company must allege with particularity the demand made, if any, to obtain action by the managers or the members who would otherwise have the authority to cause the limited liability company to sue in its own right, and either that the demand was refused or ignored or the reason why a demand was not made"); *Bernards v. Summit Real Estate Mgmt., Inc.*, 229 Or. App. 357, 363, 213 P.3d 1, 4 (2009). According to plaintiffs, "it would be entirely illogical to treat a plaintiff's statutorily excused 'failure' to make a futile demand on an entity prior to pursuit of

a derivative claim on the entity's behalf as a jurisdictional bar to the adjudication of that claim."

Similarly, plaintiffs assert that their "claims to remove [Mr.] Barton as general partner of Barton Boespflug II and Vintage Oak II are governed by California law" rather than North Carolina law. As a result of the fact that the relevant North Carolina statutory provisions apply to "a partnership formed by two or more persons *under the laws of this State*," N.C.G.S. § 59-102(8) (emphasis in plaintiffs' brief), plaintiffs assert that North Carolina's statutory limited partnership pre-suit demand requirement, N.C.G.S. § 59-1001 (providing that "[a] limited partner may bring an action in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed"), does not extend to entities, such as Barton Boespflug and Vintage Oak, which were not organized under North Carolina law. On the contrary, plaintiffs contend that California law governs their claims to remove Mr. Barton as the general partner of Barton Boespflug and Vintage Oak, citing N.C.G.S. § 59-901 for the proposition that "the laws of the jurisdiction under which a foreign limited partnership is organized govern its organization and internal affairs," and argue that, "to the extent the claims [relating to the limited partnerships] are derivative in nature, failure to make a pre-suit demand would not be fatal" under either North Carolina law, N.C.G.S. § 59-1001, or California law, Cal. Corp. Code § 15910.02 (West 2018) (providing that "[a] partner

may bring a derivative action to enforce a right of a limited partnership if" "the partner first makes a demand on the general partners, requesting that they cause the limited partnership to bring an action to enforce the right, and the general partners do not bring the action within a reasonable time" "or [making such] a demand would be futile"). As a result, plaintiffs argue that the trial court erred by dismissing their claims for Mr. Barton's removal as the general partner of Barton Boespflug and Vintage Oak based upon plaintiffs' failure to make a pre-suit demand.

In addition, plaintiffs claim that a "litigant's purported failure to satisfy a pleading requirement does not deprive a court of subject matter jurisdiction" and would, instead, "entitle the litigant's opponent to challenge the claim by way of a [ ] motion to dismiss for failure to state a claim," which "is an affirmative defense." Citing *Simon v. Manufacturers Hanover Tr. Co.*, 849 F. Supp. 880, 882 (S.D.N.Y. 1994). In view of the fact that a court may not "*sua sponte* raise an affirmative defense on a defendant's behalf," it "must refrain from [ ] independently examining whether dismissal could be appropriate based on an unraised affirmative defense that a complaint fails to state a claim upon which relief can be granted," citing *Unifund CCR, LLC v. Francois*, ___ N.C. App. ___, ___, 817 S.E.2d 915, 916 (2018). As a result, plaintiffs argue that, since defendants' motion to dismiss pursuant to N.C.G.S. § 1A-1, Rule 12(b)(1) did not rest upon an argument that "dismissal was appropriate because [plaintiffs] failed to satisfy the pleading requirements of either Or. Rev. Stat. Ann. § 63.801(2) or Cal. Corp. Code § 15910.04," any decision to affirm the trial court's

dismissal order would amount to "sanctioning a *sua sponte* invocation of an unraised affirmative defense."

Furthermore, plaintiffs contend that the common law-based "internal affairs doctrine would nevertheless vitiate the Business Court's holding" that plaintiffs' claims for the removal of Mr. Barton as manager or general partner of the investment entities were subject to the pre-suit demand requirements enunciated in N.C.G.S. § 57D-8-01(a)(2). According to plaintiffs, the internal affairs doctrine is

> a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands.

Quoting *Bluebird Corp. v. Aubin*, 188 N.C. App. 671, 680, 657 S.E.2d 55, 63, *disc. review denied*, 362 N.C. 679, 669 S.E.2d 741 (2008). Although this doctrine arose in the corporate context, plaintiffs assert that the internal affairs doctrine "has also been applied with respect to the internal affairs of limited liability companies and limited partnerships," citing *TC Invs., Corp. v. Becker*, 733 F. Supp. 2d 266, 282 (D.P.R. 2010). As a result, plaintiffs argue that the internal affairs doctrine provides another basis for concluding that plaintiffs' removal claims are subject to Oregon and California, rather than North Carolina, law.

Lastly, plaintiffs contend that "it is not clear that the claims for removal of [Mr.] Barton as manager or general partner of the Entity Appellees are purely

derivative." After recognizing that decisions from other jurisdictions have determined that similar removal claims in the limited liability company and limited partnership context are derivative in nature, plaintiffs argue that, "in accordance with the internal affairs doctrine, courts look to the state of an entity's organization to determine whether a particular claim is derivative or direct," citing *Becker*, 733 F. Supp. 2d at 282, and *Munson v. Valley Energy Inv. Fund, U.S., LP*, 264 Or. App. 679, 703, 333 P.3d 1102, 1119 (2014). According to plaintiffs, the Oregon and California courts "have eschewed strict classification of particular types of claims as either direct or derivative and have opted instead to take an ad hoc approach, evaluating whether a particular claim, as asserted in a particular lawsuit, is being asserted in a direct capacity, a derivative capacity, or both," citing *Loewen v. Galligan*, 130 Or. App. 222, 228, 882 P.2d 104, 111, *review denied*, 320 Or. 493, 887 P.2d 793 (1994), as "looking to whether a shareholder has suffered a 'special injury' to determine whether [a] claim, as asserted, was direct or derivative," and pointing to *Sole Energy Co. v. Petrominerals Corp.*, 128 Cal. App. 4th 212, 228, 26 Cal. Rptr. 3d 798, 809, *review denied*, 2005 Cal. LEXIS 8003 (2005), as holding that "[w]hether a cause of action is derivative or can be asserted by an individual shareholder is determined by considering the wrong alleged."

Plaintiffs assert that their claims to remove Mr. Barton from the management of Hess Creek and Royal Ascot "likely are at least partially direct" because Mr. "Boespflug and Azure Dolphin have undoubtedly suffered 'special injury' as a result

of Barton's abuse of his position as manager," citing *Loewen*, 130 Or. App. at 228, 882 P.2d at 111. Similarly, plaintiffs argue that, because their removal claims pertaining to Hess Creek and Royal Ascot "are 'based . . . on a fraud affecting [them] directly,' " they are, for that reason, at least partially direct, quoting *Sutter v. Gen. Petroleum Corp.*, 28 Cal. 2d 525, 530, 170 P.2d 898, 901 (1946). As a result, for all of these reasons, plaintiffs contend that the trial court erred by dismissing plaintiffs' removal claims on the basis of N.C.G.S. § 57D-8-01(a)(2).

Secondly, plaintiffs assert that the trial court erred by dismissing plaintiffs' hybrid constructive fraud and breach of fiduciary duty claim by ignoring the "allegations that a fiduciary relationship existed as a matter of law" and by improperly subjecting plaintiffs to a heightened pleading standard. According to plaintiffs, Mr. "Boespflug specifically pleaded allegations which, if taken as true, are sufficient to establish a broker-principal fiduciary relationship between [Mr.] Barton and [Mr.] Boespflug." In support of their "broker-principal" argument, plaintiffs point to the allegations contained in the amended complaint that Mr. Barton acted as Mr. Boespflug's "deal broker" and that Mr. Barton held himself out as an expert in real estate investments. In addition, plaintiffs contend that the allegations contained in the amended complaint show that a fiduciary relationship in fact existed between Mr. Boespflug and Mr. Barton. After acknowledging that the trial court, acting in reliance upon "the 'demanding' standard articulated in *Lockerman*," found that plaintiffs had failed to adequately plead the existence of a de facto fiduciary

relationship, plaintiffs contend that *Lockerman*, which was decided in a summary judgment rather than a pleading context, is irrelevant to the proper resolution of this case and has been utilized by the trial court to require plaintiffs to satisfy an impermissibly high pleading standard. As a result, since the amended complaint "adequately pleaded . . . the existence of both a de jure and a de facto fiduciary relationship," plaintiffs contend that the trial court erred by reaching a contrary conclusion.

Thirdly, plaintiffs claim that the trial court's erroneous decision to dismiss their hybrid constructive fraud and breach of fiduciary duty claim resulted in the erroneous decision to dismiss plaintiffs' unfair and deceptive practices claim. According to plaintiffs, the fact that they adequately pleaded a claim for constructive fraud sufficed to establish that they adequately pleaded an unfair and deceptive practices claim as well.

Finally, plaintiffs contend that trial court erred by denying their motion for leave to file a second amended complaint. After acknowledging that the trial court had considered "various factors sanctioned by the appellate courts of this State in its order denying [p]laintiffs' motion," plaintiffs assert that the trial court "improperly [drew] every inference and view[ed] all the circumstances in a light most favorable to the [d]efendants, who actually bore the burden of demonstrating why the (presumptively permissible) motion should not have been granted."

In urging us to uphold the challenged orders, defendants begin by noting that, "[i]n discussing the 2 October 2017 Order granting the motion to dismiss, [plaintiffs] only address five of the defendants listed in the Amended Complaint"—Mr. Barton, Barton Boespflug, Hess Creek, Royal Ascot, and Vintage Oak—and "only three of the fifteen claims for relief alleged in the Amended Complaint." In addressing plaintiffs' challenge to the dismissal of their removal claims, defendants contend that plaintiffs had "requested application of North Carolina law" and had refrained from questioning the manner in which the trial court had applied North Carolina law in dismissing their removal claims. According to defendants, "[u]nder both Oregon and California law, the necessary prerequisites to pursuing a derivative claim to remove a manager (to the extent such a claim exists) were not alleged" in plaintiffs' amended complaint, necessitating the dismissal of plaintiffs' claims under Oregon or California law. More specifically, defendants note that the Oregon statute upon which plaintiffs rely provides that the complaint in a derivative action "must allege with particularity the demand made . . . or the reason why a demand was not made," citing Or. Rev. Stat. § 63.801(2), and that the relevant California statute contains a "pleading requirement, which [ ] requires a party to plead with particularity why a demand would be futile," citing Cal. Corp. Code § 15910.02 (West 2018). Defendants argue that plaintiffs have "fail[ed] to point to any paragraph in the forty-three page Amended Complaint that purports to satisfy the particularized demand futility

pleading requirements of Oregon and California" and assert that "no such allegations were made."

In addition, defendants argue that plaintiffs' contention that their request for Mr. Barton's removal as manager or limited partner of the investment entities was "partially" derivative lacks merit. According to defendants, the relevant operating agreements provide that the "removal of a manager for gross negligence requires either the 'majority vote' or a 'unanimous vote' of all members." As a result, "even if [plaintiffs] had properly pled a claim to remove [Mr.] Barton as the manager of the [investment entities]," the Court lacks the authority to act in accordance with plaintiffs' request.

In addition, defendants claim that plaintiffs' removal claims are time barred, given that the "allegedly negligent conduct that forms the basis for requested removal occurred prior to January 1, 2013, at the latest," which means that "[t]he statute of limitations for the [ ] removal claim expired three years later, on January 1, 2016." In view of the fact that this action was not filed until 16 December 2016, defendants contend that plaintiffs' "removal claim is barred by the statute of limitations."

Secondly, defendants assert that the trial court properly dismissed plaintiffs' constructive fraud and breach of fiduciary duty claim. According to defendants, plaintiffs had attempted to establish the existence of a de facto, but not a de jure, fiduciary relationship before the trial court. Under that set of circumstances, defendants contend that plaintiffs should not be permitted to argue before this Court

that a de jure fiduciary relationship existed between Mr. Boespflug and Mr. Barton. In addition, defendants argue that plaintiffs failed to allege that Mr. Barton took any action in his capacity as Mr. Boespflug's real estate broker that would amount to a breach of that fiduciary duty.

Similarly, defendants argue that plaintiffs failed to allege sufficient facts to establish the existence of a de facto fiduciary relationship between Mr. Barton and Mr. Boespflug. More specifically, defendants contend that plaintiffs failed to allege sufficient facts to show that Mr. Barton completely dominated Mr. Boespflug. In addition, defendants assert that any conduct that might otherwise amount to the breach of a fiduciary duty, such as the issuance of the promissory notes about which plaintiffs complain, "is not a substitute for [plaintiffs'] failure to allege sufficient facts to show that a de facto fiduciary relationship arose prior [to] the time this conduct occurred."

In the same vein, defendants argue that the trial court properly dismissed plaintiffs' unfair and deceptive practices claim in light of plaintiffs' failure to allege "instances of fraud, constructive fraud, and fraud by omission." Moreover, defendants assert that plaintiffs failed to allege the occurrence of an in-state injury, which they believe to be a prerequisite to the assertion of a valid unfair and deceptive practices claim. Lastly, defendants argue that the dismissal of plaintiffs' unfair and deceptive practices claim was appropriate because "intra-corporate conduct" is not cognizable under N.C.G.S. § 75-1.1.

Finally, defendants assert that the trial court properly denied plaintiffs' second amendment motion. Although plaintiffs did include "a section in their brief requesting that the denial of their second motion to amend be reversed," defendants contend that plaintiffs' failure to provide any "substantive analysis or argument" relating to the amendment issue constituted an abandonment of plaintiffs' challenge to the denial of their amendment motion. In addition, defendants note that the various justifications that the trial court provided "in the Order denying the second motion to amend" "make[ ] it undeniable that the trial court's decision was the product of a reasoned decision." As a result, defendants contend that the trial court did not err by denying plaintiffs' second amendment motion.

## II. Substantive Legal Analysis

### A. Claims for Mr. Barton's Removal

In their initial challenge to the trial court's dismissal order, plaintiffs argue that the trial court erred by dismissing their claims for Mr. Barton's removal as the manager or general partner of certain of the investment entities for lack of standing because the claims in question were derivative, rather than personal, in nature and because plaintiffs failed to make a demand upon the entities to take action against Mr. Barton before filing suit. "We review the decision of a trial court to dismiss an action for lack of subject matter jurisdiction de novo." *Catawba County ex rel. Rackley v. Loggins*, 370 N.C. 83, 87, 804 S.E.2d 474, 477-78 (2017) (citing *Harris v. Matthews*, 361 N.C. 265, 271, 643 S.E.2d 566, 570 (2007)). Likewise, "[q]uestions of statutory

interpretation are ultimately questions of law for the courts and are reviewed de novo." *In re Ernst & Young, LLP,* 363 N.C. 612, 616, 684 S.E.2d 151, 154 (2009) (citing *Brown v. Flowe,* 349 N.C. 520, 523, 507 S.E.2d 894, 896 (1998)).

A limited liability company is defined as "[a]n entity formed under [Chapter 57D] (or former Chapter 57C of the General Statutes) that has not become another entity or form of entity by merger, conversion, or other means." N.C.G.S. § 57D-1-03(19) (2017). A "derivative action" is defined as "a proceeding brought in the superior court of this State in the right of [a limited liability company] or, to the extent provided in G.S. 57D-8-06, in the right of a foreign [limited liability company], to recover a judgment in favor of the [limited liability company] or, if applicable, the foreign [limited liability company]." *Id.* § 57D-8-01(b) (2017). A member of a limited liability company[9] may initiate a derivative action when the member "ma[kes] written demand on the [limited liability company] to take suitable action," and either the demand is rejected or "90 days [ ] expire[ ] from the date the demand was made," or, alternatively, when "irreparable injury to the [limited liability company] would result by waiting for the expiration of the 90-day period." *Id.* § 57D-8-01(a)(2) (2017).

---

[9] A member of a limited liability company is "[a] person who has been admitted as a member of the [limited liability company] as provided in the operating agreement or G.S. 57D-3-01, who was a member of the [limited liability company] immediately before the repeal of Chapter 57C of the General Statutes until the person ceases to be a member as provided in the operating agreement or G.S. 57D-3-02, or, with respect to a foreign [limited liability company], a person who has been admitted as a member of the foreign [limited liability company] under the law of the jurisdiction in which the foreign [limited liability company] is organized until the person ceases to be a member under that law." N.C.G.S. § 57D-1-03(21) (2017).

Similarly, a limited partnership is defined as "a partnership formed by two or more persons under the laws of this State and having one or more general partners and one or more limited partners, [including], for all purposes of the laws of the State of North Carolina, a limited liability limited partnership." *Id.* § 59-102(8) (2017). "A limited partner may bring an action in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed." *Id.* § 59-1001 (2017). As a result, North Carolina law contains pre-suit demand requirements applicable to derivative claims asserted against both limited liability companies and limited partnerships.

In dismissing plaintiffs' claims for the removal of Mr. Barton, the trial court determined that plaintiffs' failure to allege that they had made demand upon the investment entities in accordance with N.C.G.S. § 57D-8-01(a)(2) deprived plaintiffs of standing to maintain their removal claims and necessitated dismissal of those claims for lack of subject matter jurisdiction. Plaintiffs, however, argue that the trial court's decision to this effect was erroneous for a number of reasons, including, but not limited to, the fact that the demand rule contained in N.C.G.S. § 7D-8-01(a)(2) does not apply to limited partnerships,[10] that plaintiffs' removal claims are governed

---

[10] Although we tend to agree with plaintiffs that the demand rules for derivative claims relating to North Carolina limited liability companies and North Carolina limited partnerships are different, we need not address the nature or extent of those differences given our determination that the demand rules applicable to plaintiffs' claims are governed by foreign, rather than North Carolina, law.

by the laws of jurisdictions other than North Carolina, and that the laws of the relevant foreign jurisdictions do not contain mandatory pre-suit demand requirements of the type embodied in N.C.G.S. § 57D-8-01(a)(2). As a result, plaintiffs urge us to overturn that portion of the trial court's dismissal order relating to plaintiffs' removal claims.

As an initial matter, we are inclined to believe that plaintiffs' removal claims are, in fact, governed by foreign, rather than North Carolina, law.[11] As far as limited liability companies are concerned, N.C.G.S. § 57D-8-06 provides that, "[i]n any derivative proceeding in the right of a foreign [limited liability company], the matters covered by this Article will be governed by the law of the jurisdiction of the foreign [limited liability company's] organization." *Id.* § 57D-8-06 (2017). Similarly, with respect to limited partnerships, "the laws of the jurisdiction under which a foreign limited partnership is organized govern its organization and internal affairs . . . ." *Id.* § 59-901 (2017). As a result, the relevant North Carolina statutes indicate that plaintiffs' claims for Mr. Barton's removal as the manager of Hess Creek and Royal Ascot are governed by Oregon law and that plaintiffs' claims for Mr. Barton's removal as the general partner of Barton Boespflug and Vintage Oak are governed by California law.[12] However, the fact that the trial court's decision rested upon North

---

[11] We note, in passing, that the trial court appears to have introduced the pre-suit demand requirement issue into this case rather than the parties.

[12] In light of our understanding of the relevant statutory provisions, we need not determine whether a similar result is required under the internal affairs doctrine.

Carolina, rather than Oregon and California, law does not require reversal of the trial court's decision to dismiss plaintiffs' removal claims in this case.

According to the statutory provisions governing derivative actions brought against Oregon limited liability companies:

> Except as otherwise provided in writing in the articles of organization or any operating agreement, a complaint in a proceeding brought in the right of a limited liability company must allege with particularity the demand made, if any, to obtain action by the managers or the members who would otherwise have the authority to cause the limited liability company to sue in its own right, and either that the demand was refused or ignored or the reason why a demand was not made.

Or. Rev. Stat. Ann. § 63.801(2) (West 2018). Similarly, the California statute governing the assertion of derivative claims in the limited partnership context provides that

> [a] partner may bring a derivative action to enforce a right of a limited partnership if:
>
> (1)   the partner first makes a demand on the general partners, requesting that they cause the limited partnership to bring an action to enforce the right, and the general partners do not bring the action within a reasonable time; or
>
> (2)   a demand would be futile.

Cal. Corp. Code § 15910.02 (West 2018). According to section 15910.04 of the California Corporations Code, the complaint filed in a derivative action involving a limited partnership must state "the date and content of plaintiff's demand and the general partners' response to the demand" or "why demand is excused as futile." *Id.*

-29-

§ 15910.04 (West 2018). As a result, while plaintiffs are correct in noting that both Oregon Revised Statutes section 63.801(2) and California Corporations Code section 15910.02 contain what amounts to a "futility" exception to the otherwise-applicable pre-suit demand requirement, they overlook the fact that both Oregon and California law require that the plaintiff allege the basis for any claim of futility in any derivative complaint that he or she elects to file on behalf of a limited liability company or a limited partnership.

A careful reading of plaintiffs' amended complaint provides no indication that plaintiffs have attempted to satisfy the statutory requirement that the complaint in any derivative action that they might seek to file under either Oregon limited liability company law or California limited partnership law contain an affirmative allegation explaining why it would have been futile for them to have made a demand upon the relevant investment entities. In fact, plaintiffs do not appear to contend in their brief that they made any effort to satisfy the requirement that they affirmatively allege the basis for a contention that the making of a demand upon Hess Creek, Royal Ascot, Barton Boespflug, or Vintage Oak would have been futile. Instead, plaintiffs appear to argue that it would have been inappropriate for the trial court to raise what they describe as the "affirmative defense" of their failure to allege why it would have been futile for them to make demand upon the relevant investment entities and suggest that their removal claims were only "partially" derivative. Rather than being an affirmative defense, however, the pleading requirements set out in Oregon Revised

Statutes section 63.801(2) and California Corporations Code section 15910.02 constitute affirmative obligations that plaintiffs clearly are required to satisfy in order to assert a valid derivative claim on behalf of either an Oregon limited liability company or a California limited partnership.[13] In addition, as defendants note, plaintiffs sought Mr. Barton's removal as the manager or general partner of the relevant investment entities rather than the recovery of damages or some relief that does not affect all other interested parties associated with the relevant investment entities for some specific injury that plaintiffs claim to have sustained. For that reason, plaintiffs' removal claims strike us as quintessentially derivative, rather than personal, in nature. *Loewen*, 130 Or. App. at 229-30, 882 P.2d at 112 (stating that a claim that does not seek recovery for a "special injury" is derivative). As a result, for all of these reasons, we conclude that the trial court did not err by dismissing plaintiffs' removal claims.[14]

---

[13] As a result of the fact that the pleading requirements set out in Or. Rev. Stat. Ann. § 63.801(2) (West 2018) and Cal. Corp. Code § 15910.02 (West 2018) are clearly mandatory in nature, plaintiffs' removal claims are clearly subject to dismissal pursuant to N.C.G.S. § 1A-1, Rule 12(b)(6) even if the pleading requirement in question is not jurisdictional in nature.

[14] In light of our determination that plaintiffs failed to satisfy the applicable Oregon and California pleading requirements, we need not consider the validity of defendants' other arguments in support of the trial court's decision to dismiss plaintiffs' removal claims.

## B. Fiduciary Relationship

Secondly, plaintiffs challenge the trial court's decision to dismiss their hybrid constructive fraud and breach of fiduciary duty claim for failure to state a claim upon which relief can be granted.

> Dismissal under Rule 12(b)(6) is proper when one of the following three conditions is satisfied:  (1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.

*Wood v. Guilford County*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002) (citing *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985)).  In ruling upon a dismissal motion filed pursuant to N.C.G.S. § 1A-1, Rule 12(b)(6), "the well-pleaded material allegations of the complaint are taken as true; but conclusions of law or unwarranted deductions of fact are not admitted." *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 781 S.E.2d 1, 7-8, 368 N.C. 440, 448 (2015) (quoting *Sutton v. Duke,* 277 N.C. 94, 98, 176 S.E.2d 161, 163 (1970)).  "Our review of the grant of a motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure is de novo." *Bridges v. Parrish*, 366 N.C. 539, 541, 742 S.E.2d 794, 796 (2013).

A claim for constructive fraud only "arises where a confidential or fiduciary relationship exists." *Watts v. Cumberland Cty. Hosp. Sys., Inc.*, 317 N.C. 110, 115-16, 343 S.E.2d 879, 884 (1986) (first citing *Terry v. Terry*, 302 N.C. 77, 83, 273 S.E.2d 674, 677 (1981); and then citing *Patuxent Dev. Co. v. Bearden*, 227 N.C. 124, 128, 41

S.E.2d 85, 88 (1947)). Similarly, "[f]or a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Dalton*, 353 N.C. at 651, 548 S.E.2d at 707 (first citing *Curl v. Key*, 311 N.C. 259, 264, 316 S.E.2d 272, 275 (1984); and then citing *Link v. Link*, 278 N.C. 181, 192, 179 S.E.2d 697, 704 (1971)). In the event that a party "fail[s] to allege any special circumstances that could establish a fiduciary relationship," *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 368 N.C. 440, 449, 781 S.E.2d 1, 8 (2015), dismissal of a claim which hinges upon the existence of such a relationship would be appropriate. *See id.* at 448-51, 781 S.E.2d at 8-9 (upholding a trial court's order dismissing claims for fraud and unfair and deceptive practices given the failure of the complaint to sufficiently allege the existence of a fiduciary relationship between the parties).

"Though difficult to define in precise terms, a fiduciary relationship is generally described as arising when 'there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence.'" *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 367, 760 S.E.2d 263, 266 (2014) (quoting *Green v. Freeman*, 367 N.C. 136, 141, 749 S.E.2d 262, 268 (2013)). A fiduciary relationship may exist in law or in fact. *See Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931). For that reason, even when a fiduciary relationship does not arise as a matter of law, that is, due to the "legal relations" between two parties, it may yet exist as a matter of fact in such instances when there is "confidence reposed on one side, and the resulting

superiority and influence on the other." *Id.* at 598, 160 S.E. at 906 (quoting Pomeroy's Equity Jurisprudence, 3d Ed., Vol. 2, § 956). As a result, the ultimate issue raised by plaintiffs' challenge to the trial court's decision to dismiss the plaintiffs' hybrid constructive fraud and breach of fiduciary duty claim is whether the amended complaint alleges facts that, if believed, would suffice to establish the existence of a fiduciary relationship between Mr. Barton and Mr. Boespflug.

As an initial matter, we find no merit in plaintiffs' challenge to the standard upon which the trial court relied in determining that plaintiff had failed to state a claim for constructive fraud or breach of fiduciary duty. Although *Lockerman* was, as plaintiffs note, decided in the context of a summary judgment motion rather than a motion to dismiss for failure to state a claim upon which relief can be granted, that fact does not indicate that the trial court required plaintiffs to satisfy a "heightened pleading standard" with respect to their hybrid constructive fraud and breach of fiduciary duty claim. Aside from the fact that the language from *Lockerman* upon which the trial court relied states a general legal standard that would not vary depending upon whether a court was considering a summary judgment motion or a dismissal motion lodged pursuant to N.C.G.S. § 1A-1, Rule 12(b)(6), the trial court clearly cited *Lockerman* for the purpose of indicating that, as is required by well-established North Carolina law, detailed factual allegations, rather than mere conclusory assertions, are necessary to demonstrate the existence of a fiduciary relationship as a matter of fact. *Watts*, 317 N.C. at 116, 343 S.E.2d at 884 (stating

that, in order to "stat[e] a cause of action for constructive fraud, the plaintiff must allege facts and circumstances," among other things, " 'which created the relation of trust and confidence' ") (quoting *Rhodes v. Jones*, 232 N.C. 547, 549, 61 S.E.2d 725, 726 (1950)). As a result, the trial court's decision to dismiss plaintiffs' hybrid constructive fraud and breach of fiduciary duty claim does not rest upon a misapprehension of the pleading standard that must be satisfied in order to survive a motion to dismiss for failure to state a claim upon which relief can be granted.

As a substantive matter, plaintiffs argue that they "specifically pleaded allegations" of a "broker-principal" relationship between Mr. Barton and Mr. Boespflug and that the existence of such a relationship suffices to show that there was a fiduciary relationship between Mr. Barton and Mr. Boespflug as a matter of law. In support of this assertion, plaintiffs point to the allegations in the amended complaint stating that, "[s]ince 1986, [Mr.] Barton has acted as [Mr.] Boespflug's deal broker, recommending real estate investments and advising [Mr.] Boespflug," and that "[a] special relationship of trust was formed between [Mr.] Barton and [Mr.] Boespflug because [Mr.] Barton held himself out as a real estate investment expert generally and as [Mr.] Boespflug's advisor specifically." According to plaintiffs, these allegations "show that [Mr.] Boespflug reposed special trust and confidence on [Mr.] Barton as his real estate investment broker, property manager, and personal advisor, thereby giving rise to a fiduciary relationship between [Mr.] Barton and [Mr.] Boespflug as a matter of law." We do not find plaintiffs' argument persuasive.

A careful examination of the record indicates that plaintiffs made no effort to persuade the trial court that a fiduciary relationship existed between Mr. Barton and Mr. Boespflug as a matter of law. Instead, the only argument that plaintiffs made with respect to the fiduciary duty issue before the trial court involved an assertion that such a relationship existed between the two men as a matter of fact. In addition, the allegations contained in the amended complaint refer to Mr. Barton as a "deal broker" rather than a real estate broker, with plaintiffs having failed to present any authority defining a "deal broker," much less establishing that such a relationship is fiduciary in nature. Finally, even if plaintiffs did, in fact, allege that a real estate brokerage relationship existed between Mr. Barton and Mr. Boespflug, plaintiffs' hybrid constructive fraud and breach of fiduciary duty claim does not appear to rest upon any conduct in which Mr. Barton engaged in the context of any such relationship. As a result, for all of these reasons, we conclude that plaintiffs failed to allege the existence of a fiduciary relationship as a matter of law between Mr. Barton and Mr. Boespflug in their amended complaint.

Similarly, we are not persuaded that the allegations contained in the amended complaint suffice to establish the existence of a fiduciary relationship between Mr. Barton and Mr. Boespflug as a matter of fact. On the contrary, the amended complaint lacks allegations suggesting the existence of the "confidence reposed on one side, and the resulting superiority and influence on the other," necessary to show the existence of a fiduciary relationship as a matter of fact, *Abbitt*, 201 N.C. at 598, 160

S.E. at 906, and seems to suggest, instead, that the opposite conclusion is more appropriate. For example, plaintiffs' allegation that "[Mr.] Boespflug placed [Mr.] Barton in a position of trust and gave him some discretion to manage the Properties, reporting to [Mr.] Boespflug intermittently on the state of the portfolio" tends to suggest that Mr. Barton lacked the superior authority over the operation of the investment entities necessary to establish the existence of a fiduciary relationship in fact and, on the contrary, buttresses the trial court's description of the relationship between Mr. Barton and Mr. Boespflug as "one in which both men played a key role: [Mr.] Boespflug contributed most of the capital while [Mr.] Barton contributed most of the real estate expertise."[15] Thus, we hold that the trial court did not err by dismissing plaintiffs' hybrid constructive fraud and breach of fiduciary duty claim for failure to state a claim upon which relief can be granted.

### C. Unfair and Deceptive Practices Claim

The result that we reached with respect to plaintiffs' challenge to the dismissal of their hybrid constructive fraud and breach of fiduciary duty claim controls with respect to their challenge to the dismissal of their unfair and deceptive practices

---

[15] Although plaintiffs direct our attention to various allegations describing certain actions in which Mr. Barton allegedly engaged, including the issuance of promissory notes in exchange for Mr. Boespflug's share in the investment entities, selling various properties, and modifying certain investment entity operating agreements, these allegations, while relevant to show that Mr. Barton breached any fiduciary duty that might have existed between Mr. Barton and Mr. Boespflug, have no bearing upon the extent to which a fiduciary relationship actually existed between the two men. *See Watts*, 317 N.C. at 115-16, 343 S.E.2d at 884 (citations omitted).

claim. "In order to establish a *prima facie* claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton*, 353 N.C. at 656, 548 S.E.2d at 711 (citing *Spartan Leasing Inc. v. Pollard*, 101 N.C. App. 450, 460-61, 400 S.E.2d 476, 482 (1991)). In support of their unfair and deceptive practices claim, plaintiffs alleged in the amended complaint that defendants' "conduct described herein and throughout this complaint, including its numerous instances of fraud, constructive fraud, and fraud by omission, has a tendency to deceive, is immoral, unethical, oppressive, and unscrupulous." In dismissing plaintiffs' unfair and deceptive practices claim, the trial court stated that, "[h]aving determined that [p]laintiffs did not adequately allege facts to support their claims for constructive fraud and fraudulent conveyance (the only 'fraud' claims asserted in their complaint)," "[p]laintiffs have not alleged facts to show that Defendants committed an unfair or deceptive act under" N.C.G.S. § 75-1.1." The only basis upon which plaintiffs contend that the trial court erred by dismissing their unfair and deceptive practices claim is that they "adequately alleged a claim for constructive fraud." Having already rejected the only arguments that plaintiffs have advanced in support of their challenge to the trial court's decision to dismiss their hybrid constructive fraud and breach of fiduciary duty claim, we are compelled to reject their challenge to the dismissal of their unfair and deceptive practices claim as well. As a result, we hold that the trial court did not err by

dismissing plaintiffs' unfair and deceptive practices claim for failure to state a claim upon which relief can be granted.

### D. Amendment Motion

Finally, plaintiffs contend that the trial court erred by denying their second motion to amend their complaint. According to well-established North Carolina law, after the time for answering a pleading has expired, "a motion to amend is addressed to the discretion of the court, and its decision thereon is not subject to review except in case of manifest abuse." *Calloway v. Ford Motor Co.*, 281 N.C. 496, 501, 189 S.E.2d 484, 488 (1972) (citations omitted). A trial court abuses its discretion in the event that its decision " 'is manifestly unsupported by reason' or 'so arbitrary that it could not have been the result of a reasoned decision.' " *Frost v. Mazda Motors of Am., Inc.*, 353 N.C. 188, 199, 540 S.E.2d 324, 331 (2000) (quoting *Little v. Penn Ventilator Co.*, 317 N.C. 206, 218, 345 S.E.2d 204, 212 (1986) (first quoting *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985); and then quoting *State v. Wilson*, 313 N.C. 516, 538, 330 S.E.2d 450, 465 (1985))). "Among proper reasons for denying a motion to amend are undue delay by the moving party and unfair prejudice to the nonmoving party." *News & Observer Publ'g. Co. v. Poole*, 330 N.C. 465, 485, 412 S.E.2d 7, 19 (1992) (citing *Patrick v. Ronald Williams, P.A.*, 102 N.C. App. 355, 360, 402 S.E.2d 452, 455 (1991)).

In challenging the denial of their second amendment motion, plaintiffs note that N.C.G.S. § 1A-1, Rule 15(a) provides that "leave [to amend] shall be freely given

when justice so requires" and contend that the trial court erroneously placed the burden of proof upon them to establish that their amendment motion should be allowed rather than requiring defendants to establish why their amendment motion should not be allowed, citing *Mauney v. Morris*, 316 N.C. 67, 72, 340 S.E.2d 397, 400 (1986) (stating that "[t]he burden is upon the opposing party to establish that that party would be prejudiced by the amendment" (citing *Roberts v. William N. & Kate B. Reynolds Mem'l Park*, 281 N.C. 48, 58, 187 S.E.2d 721, 727 (1972))). We do not find plaintiffs' argument persuasive.

Aside from the fact that the record contains no reason to believe that the trial court's order denying plaintiffs' second amendment motion rested upon an impermissible placement of the burden upon plaintiffs rather than defendants, a careful review of the relevant provisions of the trial court's order demonstrates that it had ample justification for denying plaintiffs' second amendment motion. As an initial matter, the trial court noted that it had already allowed plaintiffs to file an amended complaint while admonishing plaintiffs to comply with the applicable Business Court rules in the future. However, instead of filing the amended complaint which had been attached to their amendment motion within the time specified in the trial court's amendment order, plaintiffs sought an extension of time within which to make the required filing. After the trial court, despite denying plaintiffs' extension motion, gave plaintiffs a new deadline within which to file their amended complaint, plaintiffs filed an amended complaint that differed from the amended complaint that

had been attached to their amendment motion. Even so, the trial court allowed plaintiffs to file the amended complaint that had been attached to their amendment motion and treated it as their complaint for purposes of future proceedings in this case. Within only a few weeks after the filing of their amended complaint, plaintiffs sought leave to file a second amended complaint that was not accompanied by a brief or a statement of opposing counsels' position, and that essentially "undid" a significant number of the changes that had been made to their original complaint in their amended complaint. In light of these determinations, which plaintiffs concede are relevant to a proper analysis of whether an amendment motion should be allowed or denied and which provide ample support for the trial court's conclusion that plaintiffs' second amendment motion involved "undue delay," suggested a "dilatory motive," and was neither accompanied by a brief nor a statement of the position of opposing counsel as required by the applicable Business Court Rules, we have no hesitation in concluding that the trial court did not abuse its discretion by denying plaintiffs' second amendment motion.

### III. Conclusion

Thus, for all of these reasons, we conclude that the trial court did not err by dismissing plaintiffs' amended complaint and denying plaintiffs' second amendment motion. As a result, the challenged trial court orders are affirmed.

AFFIRMED.